# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) ) ) | Case No. 17 - 11032 |
| v. | ) ) | **FILED UNDER SEAL** |
| SCOTT J. WOLAS,<br>Defendant. | ) ) ) | |

## UNITED STATES' *EX PARTE* VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION

Plaintiff, the United States of America, by and through the undersigned attorneys, hereby alleges as follows:

### JURISDICTION AND VENUE

1.     The United States brings this action for a temporary restraining order, preliminary and permanent injunction, and other equitable relief pursuant to 18 U.S.C. § 1345.

2.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1345, and 28 U.S.C. §§ 1331 and 1345.

3.     This Court has personal jurisdiction over Defendant and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because Defendant resided in this District, transacted business in this District, and Defendant's actions that gave rise to this case occurred in this District, and elsewhere.

### THE PARTIES

4.     Plaintiff is the United States of America (the "United States").

5.     Defendant Scott J. Wolas (the "Defendant" and "Wolas" and "Grathwohl"), formerly resided in Quincy, Massachusetts and at different times has used aliases, including Eugene J. Grathwohl, Allen L. Hengst, Drew Prescott, and Endicott Asquith.  On April 4, 2017,

a United States Magistrate Judge in Boston, Massachusetts found probable cause that the Defendant committed wire fraud, in violation of 18 U.S.C. § 1343, and aggravated identity theft, in violation of 18 U.S.C. 1028A, and issued an arrest warrant for the Defendant. *See United States v. Scott J. Wolas*, 17-MJ-2046-MBB. The criminal action is pending.

### THE FRAUD SCHEME[1]

6.      The United States' criminal investigation has determined that from at least 2009 through 2016, a person identifying himself as Eugene J. Grathwohl ("Grathwohl")[2] was a resident of Quincy, Massachusetts and the principal of a corporation entitled Increasing Fortune, Inc.  Documents filed with the Massachusetts Secretary of the Commonwealth show that this corporation was established in December 2009 to conduct a real estate business and listed Grathwohl as president, treasurer, secretary and director.  Also during 2009 through 2016, Grathwohl worked as a licensed real estate agent for Century 21 Annex Realty in Quincy, Massachusetts.

7.      From 2014 through 2016, Grathwohl solicited investments in, among other things, two real estate development projects that he was orchestrating in Quincy:

    a.  the construction of a single family home at 833 Quincy Shore Drive, Quincy, Massachusetts; and

---

[1] In April 2017, a United States Magistrate Judge in this District issued an arrest warrant, based on a showing of probable cause to believe that Wolas had committed wire fraud and aggravated identity theft. *United States v. Scott J. Wolas, a/k/a Eugene J. Grathwohl, a/k/a Allen L. Hengst, a/k/a Drew Prescott, a/k/a Frank Amolsch, a/k/a Endicott Asquith, a/k/a Cameron Sturge*, 17-MJ-2046 -MBB.  For ease of review, most, if not all, of the factual allegations from the complaint affidavit are included herein.

[2] As described below, the investigation has revealed that Wolas was the individual identifying himself as Grathwohl.

   b. the development of a commercial property located at 797 Quincy Shore Drive, Quincy, Massachusets, that was formerly occupied by the Beachcomber Bar. This property is located next door to the 833 Quincy Shore Drive property.

8. For each of the investors in these two projects, Grathwohl signed a contract pledging to pay back the investor's principal investment plus a share of the profits realized once Grathwohl sold the property. Through written and/or oral representations, Grathwohl promised the investors that their money would be used for construction and other expenses related to developing both properties. In total, Grathwohl collected more than $1.5 million from at least 19 investors, but, as detailed later in this complaint, he used most of the funds on personal and other expenses unrelated to the development of the projects, drained the bank account of funds, and fled Massachusetts.

9. Grathwohl did not own either of these two properties for which he solicited investments. With respect to 833 Quincy Shore Drive, Grathwohl had an agreement with the landowner that he could develop the property, and then the two men would share in the profits once the property sold. In the investment contracts related to 833 Quincy Shore Drive, however, Grathwohl promised at least 10 investors that they would each receive their principal investment amount plus a percentage of profits realized from the sale of the property, ranging from 7 to 30 percent. In doing so, Grathwohl pledged to pay out at least 125 percent of the profits earned from the sale of 833 Quincy Shore Drive. Indeed, the contracts indicate he promised to pay even more than that as certain contracts left open the percentage of the profit to be realized depending on the total number of investors.

10. With respect to the Beachcomber property located at 797 Quincy Shore Drive, Grathwohl presented potential investors with an elaborate plan to build several condominiums and a boutique restaurant on the site. In return for investments in the Beachcomber

development, Grathwohl promised to pay investors back their principal investment amount plus a small percentage of the profits realized from the re-sale of the property after development. Grathwohl told investors that he had family money in a trust fund in Europe and he planned to use this money toward the purchase of the Beachcomber property.

11.     On or about May 4, 2015, Grathwohl signed a purchase and sale agreement to purchase the Beachcomber property for $1.4 million. The agreement required him to pay $90,000 into an escrow account and the closing was to occur approximately 60 days later. On July 25, 2015, after Grathwohl was unable to come up with enough money to finalize the purchase of the Beachcomber property, he signed an extension agreement with the current owner. The agreement required him to pay a non-refundable deposit of $40,000 to be added to the purchase price of the property, and it allowed the closing date to be rescheduled for September 9, 2015.

12.     Over the course of the next year, Grathwohl sought at least 11 extensions to the closing date for his purchase of the Beachcomber property, each time paying between $20,000 and $60,000 in penalties to maintain his purchase and sale agreement with the seller. By September 2016, Grathwohl had paid $450,000 in penalties to the owner of the Beachcomber property, thereby raising the purchase price to $1.85 million but getting him no closer to actually owning the property.

13.     In total, Grathwohl collected more than $1.5 million from at least 19 investors in connection with 833 Quincy Shore Drive and the Beachcomber property. He deposited all of the money into a Santander Bank account, x-6034, which he opened in the name of Increasing Fortune Inc. In addition to investors' money, Grathwohl also deposited the commissions he earned as a real estate agent into the Santander Bank account.

4

14.     The signature card for the Santander Bank account indicates it was opened on or about December 23, 2009, and that Grathwohl provided a date of birth (xx-xx-1944) and a Social Security number (xxx-xx-0125).  Grathwohl also provided a Massachusetts driver's license, number S58473784, which bore the same identifiers.  Grathwohl was the only authorized signer on the Santander Bank account.

15.     According to the account records, although it appears that Grathwohl did pay approximately $265,000[3] toward construction costs at 833 Quincy Shore Drive, he used the majority of investors' money for purposes unrelated to real estate development and to pay $450,000 in penalties in order to maintain the appearance that he was in a position to purchase the Beachcomber property.

16.     For example, from early 2014 through September 2016, Grathwohl spent over $98,000 to purchase stamps, books, and other collectible items from PayPal.  He also spent more than $50,000 dining out at restaurants and over $6,000 on mailing packages via FedEx, UPS, and the United States Postal Service.  From 2014 through September 2016, Grathwohl withdrew large sums of cash, totaling more than $600,000, for unknown purposes.  Finally, from May 2014 to February 2016, Grathwohl wrote checks totaling more than $300,000 to an individual who moved some of the money into a foreign currency exchange company and transferred some of it to people residing outside of the United States, again, for unknown purposes.  There is nothing to indicate that this individual is associated with the development of either 833 or 797

---

[3] In the affidavit in support of the criminal complaint, Special Agent Bell stated that the Defendant paid at least $350,000 towards construction costs.  However, subsequent interviews revealed that the Defendant actually paid approximately $265,000.

Quincy Shore Drive and the records do not show any of these funds being directed to contractors or the like.

17.     Based on what Grathwohl told them, and what their contracts provided, many of the investors believed that Grathwohl would complete construction of 833 Quincy Shore Drive by the end of summer 2016. Therefore, they expected to receive payments around that time. By early September 2016, however, 833 Quincy Shore Drive was still not complete. Additionally, the extended closing date for Grathwohl's purchase of the Beachcomber property was scheduled for September 15, 2016, and Grathwohl needed to have more than $1 million at closing in order to acquire the Beachcomber property.

18.     On September 8, 2016, Grathwohl's girlfriend, with whom he lived in Quincy, dropped him off at the JFK/UMass MBTA station. She advised me that he told her he was going on a business trip to raise the remainder of the money needed to purchase the Beachcomber property. When his girlfriend dropped him off at the train station, Grathwohl had a duffle bag and a laptop computer with him.

19.     Grathwohl never returned to his home in Quincy, Massachusetts, and he ceased all contact with his girlfriend, his co-workers, and his investors. To date, Grathwohl has not paid back any of the nineteen real estate investors' original investment money, and he has not paid any returns on investment. After Grathwohl missed the closing for the Beachcomber property on September 15, 2016, several investors reported Grathwohl to the Quincy Police Department.

20.     There are no funds left in the Santander Bank account. Checks written on the account started to be returned for insufficient funds on or about September 8, 2016, the date Grathwohl was dropped off at the MBTA station.

21.     Particular details relating to one of the approximately nineteen investors are set forth below.

### Investor #1[4]

22.     In or about March 2016, Investor #1 met Grathwohl when she hired him to act as the real estate agent for the sale of her condominium in Quincy, Massachusetts. Investor #1 is a resident of Utah. In June 2016, after the tenants had vacated her condominium, Investor #1 and a few family members traveled to Massachusetts to clean the unit and make some improvements to it. In mid-July 2016, Grathwohl came by to take photographs of the unit for the sales listing. At that time, he started talking to Investor #1 about investing in one of his real estate development projects.

23.     Grathwohl said that he was already working on construction of the single family home located at 833 Quincy Shore Drive. He also mentioned that he would be developing the commercial property next door where the Beachcomber Bar used to operate. Grathwohl took Investor #1 out to lunch on multiple occasions to entice her into investing with him. He also had his driver take them to see The Strand, a cluster of three housing units located close to 833 Quincy Shore Drive that Grathwohl had previously renovated and resold. Grathwohl told Investor #1 that he was looking for investors to invest at least $100,000, but he would accept a minimum of $56,000. He promised to pay back Investor #1's principal plus 50 percent interest within ninety days.

24.     Investor #1 told Grathwohl that she would not have access to that much money unless she pulled it out of her Individual Retirement Account (IRA), and then she would have to

---

[4] Investor #1's identity is known to the United States but is omitted to protect her privacy.

return it to her IRA within sixty days to avoid penalties. Grathwohl agreed to pay back her principal investment plus 50 percent interest within sixty days.

25.     Investor #1 decided to invest $98,000 into construction of 833 Quincy Shore Drive. Grathwohl drew up a draft contract and hand-delivered it to Investor #1 before she departed Massachusetts and flew back to Utah. Once in Utah, Investor #1 requested changes to the contract, so Grathwohl made corrections. On July 25, 2016, he emailed a new version to her which bore his signature. The contract required Investor #1 to invest $98,000, to be provided to Grathwohl no later than August 2, 2016. The contract also guaranteed that Grathwohl would repay $98,000 to Investor #1's IRA account by September 26, 2016, and would deposit $49,000 to her checking account by October 1, 2016.

26.     Investor #1 transferred $98,000 from her IRA to her checking account. Following wire transfer instructions provided by Grathwohl, on August 2, 2016, she went to her local Central Bank branch in Utah and initiated a wire transfer of $98,000 to Grathwohl's Santander Bank account x-6034 in the name of Increasing Fortune Inc. that was controlled by Grathwohl in Massachusetts.

27.     Based on Grathwohl's oral and written promises, Investor #1 expected that all of her investment money would be used toward construction of 833 Quincy Shore Drive. From early August until early September 2016, Grathwohl sent text messages to Investor #1 every couple of days. The text messages contained updates and photographs of the progress being made at 833 Quincy Shore Drive. In early September 2016, Grathwohl failed to contact Investor #1 for several days, so she called Grathwohl's girlfriend and learned that Grathwohl had disappeared.

28.    Investor #1 never received any money back from Grathwohl. She incurred a 10 percent penalty for debiting $98,000 from her IRA early and she is unable to afford the income taxes she now owes.

### Existing Charges Against Wolas and His Use of Aliases

29.    Soon after Grathwohl vanished from Quincy, Massachusetts, law enforcement officials determined that Grathwohl was actually an alias, and the true name of the person who defrauded the Quincy investors is Scott J. Wolas. Wolas had been a fugitive since 1997[5] when he was indicted for 119 counts of fraud and grand larceny by the New York County District Attorney's Office. Wolas had been a practicing attorney in New York but was disbarred after being charged with soliciting tens of millions of dollars from investors in a fraudulent liquor exporting scheme.

30.    Quincy Police provided a photograph of the individual who had held himself out as Grathwohl to the District Attorney's office in New York. An investigator there who had been involved in the 1997 New York case identified the photograph as Wolas. In addition, Quincy Police obtained a New York driver's license photo of Wolas. Quincy Police Detective Thomas Pepdjonovic showed this photograph of Wolas to the girlfriend in Quincy and she confirmed that it was the same person whom she had been living with and knew as Eugene Grathwohl.

31.    After leaving New York prior to being indicted there, Wolas traveled to Florida and assumed the identity of Allen L. Hengst ("Hengst"). Hengst had been Wolas's roommate in college at Georgetown University in Washington, D.C. While in Florida, Wolas (now known as Hengst) obtained a license to sell securities. In 2001, after law enforcement authorities

---

[5] As described later in this complaint, Wolas was arrested in Delray Beach, Florida, on April 7, 2017.

determined that Hengst was an alias being used by Wolas, the Tampa Division of the FBI obtained an Unlawful Flight to Avoid Prosecution ("UFAP") warrant in Wolas's name.[6] By that time, though, Wolas had already relocated to Massachusetts.

32.     Wolas's Quincy girlfriend advised that she met him online via Yahoo! Personals in 2001. At that time, he was using the name Drew Prescott, and he was unemployed. By 2002, Wolas had found work as a bartender and changed his name to Frank Amolsch. Wolas explained to his girlfriend that he had previously worked for a secret service and was currently in the witness protection program, so he needed to change his identity periodically. Finally, by 2009, Wolas assumed the identity of Eugene Grathwohl and obtained a real estate license in that name.

33.     As a result of the conduct in Quincy described in this complaint, the Norfolk County (Massachusetts) District Attorney's Office charged Wolas with embezzlement, larceny, and identity fraud.

34.     As described above, Wolas, opened the Santander account x-6304, using the name Eugene Grathwohl and providing a date of birth in 1944 and a Social Security number of xxx-xx-0125. There is a real person with that name, DOB and SSN. On November 17, 2016, IRS-CI Special Agent Matthew Coughlan and Quincy Police Detective Thomas Pepdjonovic interviewed the real Grathwohl, who presently lives in Delray Beach, Florida. The real Grathwohl advised that he (Grathwohl) knew Wolas as the ex-husband of a friend of his and also that he met Wolas in person on a couple of occasions.

35.     In September 2016, Witness #1[7] met Wolas on a dating website. By that time, Wolas had begun using the alias Endicott Asquith. In October 2016, Witness #1 met Wolas in

---

[6] The UFAP warrant for Wolas's arrest was dismissed in 2010 and is no longer active.

[7] Witness #1's identity is known to the United States but omitted to preserve her privacy.

person for dinner on Cape Cod, Massachusetts.  After that, they continued to communicate via telephone and email, and "Asquith" mailed several packages to Witness #1 at her home and at her workplace.  Wolas told Witness #1 that he was involved in clandestine work.  On or about March 24, 2017, Witness #1 received a package from "Asquith" that contained current photos of him.  Special Agent Bell reviewed these photos and confirmed that they do, in fact, depict Wolas.

36.     On or about March 30, 2017, Witness #1 was talking to Wolas on the phone and she overheard someone ask him for directions to a place in Delray Beach, FL.  She asked if he was in Delray Beach and Wolas said he was not, that he was still in Georgia at a training facility for his clandestine work.  Witness #1 told Wolas she did not believe him and hung up the phone.

37.     After the telephone conversation described above, Wolas texted Witness #1 and asked that she meet him in person that weekend.  When she asked whether the meeting would be in Delray Beach, he said yes, and the two agreed to talk again on March 31, 2017.  During the later phone conversation, Wolas told Witness #1 that he was going to "come clean."  He admitted that he was not Endicott Asquith and that his true name is Scott Wolas. Wolas said he was currently using the name Cameron Sturge.  Wolas encouraged Witness #1 to Google him and the Beachcomber real estate deal to find out more about him.

**Complaint Charging Cecily Sturge With Violating 18 U.S.C. § 1001 (false statements)[8]**

38.     Cecily Sturge ("Sturge") is Wolas's ex-wife and the mother of one of his sons. Cellular telephone number xxx-xxx-7716 is registered to and subscribed to Sturge at her residence in Delray Beach, Florida ("Sturge's Telephone").

39.     While Wolas lived and worked in Quincy, Massachusetts, he used one telephone number, xxx-xxx-8135 (Wolas Telephone #1), to communicate with his investors and co-workers.  Prior to her interview with Sturge on November 17, 2016, as described below, Special Agent Bell reviewed Wolas Telephone #1 records for the period September 4, 2016 to September 11, 2016 and determined that there was one contact between Wolas Telephone #1 and Sturge's Telephone on September 6, 2016.  On that date, Wolas Telephone #1 received an incoming call from Sturge's Telephone which lasted 68 seconds.

40.     On November 17, 2016, as part of the investigation into Wolas's Massachusetts investment scheme, and in an attempt to locate him, Quincy Police Detective William Monteith and Special Agent Bell interviewed Sturge at her residence in Delray Beach. Special Agent Bell and her colleague told Sturge that they were investigating a fraud that they believed Wolas, using the identity of Eugene J. Grathwohl, had committed in Massachusetts.  Sturge said she was aware from news articles that Wolas was under investigation.  Sturge said that her most recent contact with Wolas was about 15 years ago. Even after Special Agent Bell advised Sturge that it is a crime to lie to a federal agent, she insisted that she had not been in touch with Wolas for many years.  She stated that she did not know where Wolas was and that she had no contact

---

[8] A complaint was issued in this district on May 25, 2017, charging Sturge with knowingly making a materially false statement in violation of 18 U.S.C. § 1001. *United States v. Cecily Sturge,* 17-MJ-6153-MPK.  The allegations from that complaint are also substantially reproduced here.  This complaint remains under seal pending Sturge's arrest.

information for him. Sturge admitted that her cellular telephone number was xxx-xxx-7716, but she claimed to have no knowledge of the telephone call made from that number to Wolas Telephone #1 on September 6, 2016. At the end of the interview, Special Agent Bell served Sturge with a grand jury subpoena requiring her appearance and testimony in this District on a later date. She said she would not appear.

41.     After her interview with Sturge, and as a result of further investigation, in about March 2017, Special Agent Bell learned of two additional telephone numbers that Wolas used to communicate with Witness #1 described above who Wolas met on an online dating site in September 2016, xxx-xxx-7436 (Wolas Telephone #2) and xxx-xxx-5252 (Wolas Telephone #3). In February 2017, Special Agent Bell also obtained records for Sturge's Telephone for the period of July 1, 2016 through November 22, 2016. Special Agent Bell reviewed Sturge's telephone records for contact with Wolas Telephone #2 and Wolas Telephone #3.

42.     Wolas Telephone #2 was only active from September 5, 2016 through September 20, 2016, but during that short time period, Sturge's Telephone was in contact with Wolas Telephone #2 on 28 occasions, including incoming and outgoing calls and text messages. For example, on September 9, 2016—the day after Wolas is believed to have fled Massachusetts— Sturge's Telephone made an outgoing call to Wolas Telephone #2 that lasted six minutes, and on September 15, 2016, Sturge's Telephone made an outgoing call to Wolas Telephone #2 that lasted 11 minutes.

43.     Wolas Telephone #3 was active from September 9, 2016 through Wolas's arrest on April 7, 2017. Records for Sturge's Telephone indicate that her phone was in contact with Wolas Telephone #3 several times a week from October 8, 2016 through November 22, 2016. During that six-week period, there were 62 contacts between Sturge's Telephone and Wolas

Telephone #3, including incoming and outgoing calls and text messages. On November 15, 2017, just two days prior to Special Agent Bell's interview with Sturge, there was an outgoing call from Sturge's Telephone to Wolas Telephone #3 that lasted more than three minutes, and Sturge's Telephone received two additional calls from Wolas Telephone #3 on the same day. There also was one call from Wolas Telephone #3 to Sturge's Telephone on November 22, 2017, which lasted 53 seconds.

44.     When the FBI and Quincy Police Department arrested Wolas at a residence in Delray Beach, Florida on April 7, 2017, Special Agent Bell learned from the homeowner that Wolas had rented the room in her condominium using the name Cameron Sturge ("Cameron"). The homeowner advised that she first met Cameron, and Sturge, in November 2016 when the room was rented through an Airbnb.com account in the name of Cecily Sturge. This rental is described in more detail in the following paragraphs.

45.     On November 9, 2016, someone using the Airbnb screen name "Cecily Sturge" contacted the homeowner via Airbnb.com. Special Agent Bell viewed screenshots of the messages sent back and forth between the homeowner and this Airbnb user, and Special Agent Bell observed that the photograph attached to screen name "Cecily Sturge" does, in fact, depict Sturge.

46.     The messages to the homeowner state that her [Sturge's] "brother" Cameron was a retired paleontologist and was seeking a place to stay in Delray Beach from November 12, 2016 through November 21, 2016. After the homeowner confirmed the reservation, the parties exchanged telephone numbers. Wolas (using the name Cameron) called the homeowner to introduce himself, and the homeowner also spoke to Sturge by telephone. The homeowner told

14

Sturge that she wanted to meet Sturge in person because it was Sturge's Airbnb account that was used to make the rental reservation.

47.     On November 12, 2016, just five days prior to Special Agent Bell's interview with Sturge, Wolas and Sturge arrived at the condominium together in the same car for Wolas's first day staying there.  The homeowner confirmed that the woman depicted in the photo on the Airbnb.com account in the name of Cecily Sturge is the same woman who arrived in the car with Wolas when he first stayed at her condominium from November 12 through November 21, 2016. As noted above, Special Agent Bell viewed that photo and it depicts Sturge, who she interviewed on November 17, 2016.  As noted, during that interview, Sturge denied having any contact with Wolas in the last 15 years, denied having any contact information for him, and denied that she knew where he was.

### Additional false statements by Sturge in Florida Dissolution Proceeding[9]

48.     In November 2001, by default judgment, Sturge was granted a divorce from Wolas in Case No. 50-2001-DR-00783-DIFZ-SB in the Circuit Court for Palm Beach County, Florida.

49.     On February 8, 2017, Sturge filed a petition to modify the judgment in order to obtain the contents of Wolas's retirement account at the New York law firm where he worked prior to being indicted by New York authorities.  Special Agent Bell was informed that there is approximately $647,000 in this account (hereinafter the "retirement account").

50.     In her sworn petition to obtain the retirement account, Sturge acknowledged that she was "swearing or affirming under oath to the truthfulness of the claims made in this petition"

---

[9] The Florida dissolution proceeding is where Wolas and Sturge have, as shown in this complaint, been working together to dissipate the one identified asset sought to be restrained in this action before the Court.

and that she understood that the penalties for making a false statement included fines and/or imprisonment. In her supporting affidavit also filed on February 8, 2017, Sturge stated that her former spouse's "location, mailing address and whereabouts remain unknown to me today" and that she had attempted to serve him with the petition "at the last location where I had contact with him in approximately 1995."

51.     Special Agent Bell reviewed records of Wolas Telephone #3 for the period of February 1, 2017, to February 28, 2017. Although Special Agent Bell had records only of the outgoing calls from Wolas Telephone #3 for this period, they show a total of 25 calls to Sturge's Telephone with the calls ranging in duration from 11 seconds to 2 minutes 23 seconds. There is at least a call every other day from Wolas Telephone #3 to Sturge's Telephone during this period.

52.     On March 30, 2017, Sturge submitted a supplemental affidavit in the Florida proceeding for the stated purposes of adding an omitted exhibit, to correct formatting and typographical errors and to update the "unsuccessful attempts to personally serve the respondent [Wolas] in connection with this petition." She again stated that Wolas's "whereabouts are unknown."

53.     Special Agent Bell has reviewed the records of incoming and outgoing calls/texts for Wolas Telephone #3 during the period of March 1 through March 26, 2017. There are a total of 20 contacts, mostly texts, between Wolas Telephone #3 and Sturge's Telephone during this period, including one two-minute call on March 7, 2017, and four one-minute calls on March 21, March 23, March 24, and March 26, 2017 respectively.

54.     As noted previously in this complaint, Wolas was arrested on April 7, 2017, in Delray Beach, Florida. At the same time, the contents of his room—including various

16

documents, three telephones, a laptop computer and three thumb drives—were seized pursuant to a search warrant.

55.   Among the documents seized from the room was what appeared to be a copy of the sworn petition to modify the dissolution judgment referenced above which Sturge filed on February 8, 2017.  The document seized from Wolas's room differs from the filed document in at least two respects, however:  1) it does not have the footer which appears on the bottom of each of the pages of the filed pleading stating the date and time of filing, *i.e.* "2/8/2017 4:29:00PM"; and 2) the notarized signature pages are different, as shown in redacted form below.[10]

**Seized from Wolas's Room**     **Filed in Florida Court**



---

[10] The documents are displayed with the following additional redactions: Sturge's address, all but the last four digits of her cellular telephone number, and all but the last digits of her driver's license number in both documents.

17

This suggests, at the very least, that the hard copy found in Wolas's room is not merely a duplicate of the document on file with the court clerk, which Wolas presumably could obtain without Sturge's knowledge. Similarly, law enforcement also seized from Wolas's room an unsigned copy of Sturge's supplemental affidavit (the signed version of which Sturge filed on March 30, 2017), which reaffirmed that Sturge had no idea of Wolas's whereabouts, along with all of the supporting exhibits. As with the petition to modify, the hard copies of the supplemental affidavit and accompanying exhibits found in Wolas's room do not bear the stamped date/time filing footer that is present on the documents in the court file. Among the exhibits is one which shows that process (on Wolas) was attempted at 23440 Mirabella Circle in Boca Raton, Florida, an address Sturge claims to have been Wolas's last known address and "the last location where I had contact with him in approximately 1995."

56.     Copies or drafts of at least two of the documents filed in the dissolution modification proceeding also were on one of the thumb drives seized from Wolas's room. That is, what appears to be a scanned copy of Sturge's designation of email and mailing address form, which contains some hand-written entries and which appears to be partially completed, was on Wolas's thumb drive. The form on the thumb drive, however, did not include Sturge's email, which appears on the filed copy. Also, the thumb drive version bore the handwritten date of 2/8/17, but the document as filed showed the handwritten 2/8/17 date crossed out and replaced with 2/14/17, the date of filing. Additionally, the notice of petition to modify and attached exhibits described above were also on Wolas's thumb drive.

57.     A number of spiral bound stenographer's notebooks were seized from Wolas's room at the condominium as well. On a page in one of these notebooks, among other notes in

what Special Agent Bell believes to be Wolas's handwriting, there is this handwritten statement: YOU DO NOT NEED TO LOOK AT QDRO[11]."

58.     Based on Special Agent Bell's training and experience and the evidence described herein, there is probable cause to believe that Wolas knew about the retirement account at the time of his arrest on April 7, 2017.

59.     Nevertheless, on April 7, 2017, shortly after his arrest, Wolas appeared before a magistrate judge in the Southern District of Florida, West Palm Beach Division.  The judge questioned Wolas, under oath, regarding his ability to hire counsel and the following exchange occurred:

THE COURT: Do you have any money saved anywhere in the world, sir?

THE DEFENDANT: I do not.

THE COURT: Whether it is in a bank account or a box full of money sitting somewhere?

THE DEFENDANT: Not a penny.

THE COURT: Is anybody holding any money for you anywhere in the world?

THE DEFENDANT: No, they are not.

THE COURT: Do you own any real property or land anywhere in the world?

THE DEFENDANT: No, sir.

THE COURT: Do you own anything worth more than $5,000 anywhere in the world?

THE DEFENDANT: I do not, Your Honor.

---

[11]    QDRO stands for Qualified Domestic Relations Order and is what Sturge was seeking from the Florida Court to obtain the contents of Wolas's retirement account.

After this colloquy, the judge appointed a federal public defender to represent Wolas. Wolas also is represented in the pending District of Massachusetts criminal action by the federal defender's office.

60.     At the time of this sworn colloquy, the retirement account held more than $647,000 on Wolas' behalf.

61.     Based on the foregoing, probable cause exists to believe that Wolas, who had been a practicing lawyer before being charged in the New York case, had been assisting Sturge in securing the funds from the retirement account prior to his arrest on April 7, 2017, that Wolas lied to the Court about his assets, and that Sturge has repeatedly lied about her contacts with Wolas and her knowledge of his whereabouts, including when the FBI interviewed her on November 17, 2016.

62.     On April 25, 2017, Wolas filed an affidavit in the Florida dissolution proceeding and agreed to the entry of an order directing that Sturge receive the entire contents of his retirement plan, an order which was entered by a Florida Circuit Court judge on May 15, 2017.[12]

## THE BANKING LAW VIOLATIONS (MONEY LAUNDERING)

63.     As noted above, between 2014 and 2016, Wolas collected more than $1.5 million in investor funds and deposited all of the money into Santander Bank account, ending in 6034, which he opened in 2009 in the name of Increasing Fortune, Inc. and for which he was the sole signatory. He also deposited presumably legitimate funds from his work as a real estate agent into this account.

---

[12] Special Agent Bell has been informed that the account has not yet been transferred to Sturge.

64.     Also as noted above, there are no longer any funds in this account and checks

drawn on the account started to be returned for insufficient funds on or about September 8, 2016,

the date Wolas is believed to have fled Massachusetts.

65.     Special Agent Bell reviewed this account and assisted IRS-CI Special Agent

Matthew Coughlan in analyzing the deposits and withdrawals from that account over the course

of the investment scheme that Wolas operated.  As further detailed in the chart below, that

analysis has indicated that between on or about August 18, 2015, and on or about September 8,

2016, Wolas knowingly engaged in at least 38 monetary transactions of more than $10,000 in

criminally derived property, that is, investor funds, in violation of 18 U.S.C. § 1957.

66.     For 37 of the transactions, each transaction involved more than $10,000.  The

remaining transaction is an aggregation of four cash withdrawals over four days totaling

$10,410.  In all, Wolas engaged in monetary transactions (or attempted transactions)[13] totaling

$692,082.52.

67.     The chart below lists checks that Wolas wrote on the Santander account and the

date those checks cleared his account.  Wires are identified by a tracking number.  Account

transfers identify the recipient bank, where known, but by the last digits of the account number in

any case.  Cash refers to cash withdrawals from the Santander account.  Santander, which is

headquartered in Massachusetts, is FDIC insured and is a financial institution as defined in 31

U.S.C. § 5312.

---

[13] The 37th transaction in the chart details a September 8, 2016 check drawn on the account for
$10,600.  This check was returned for insufficient funds.  Nevertheless, this transaction is also a
violation of 18 U.S.C. § 1957.

| | Date | Transaction Type | Check No., Recipient Account or IMAD[14] Number | Amount |
|---|---|---|---|---|
| 1 | 8/18/2015 | Check | 1038 | $37,500.00 |
| 2 | 8/18/2015 | Check | 1193 | $18,500.00 |
| 3 | 10/2/2015 | Check | 1274 | $10,000.00 |
| 4 | 10/5/2015 | Check | 1237 | $12,500.00 |
| 5 | 12/8/2015 | Check | 5200 | $14,000.00 |
| 6 | 12/8/2015 | Check | 5199 | $12,000.00 |
| 7 | 12/9/2015 | Wire | 20151209C1QAE01X000174 | $42,000.00 |
| 8 | 12/9/2015 | Check | 0742597 | $10,000.00 |
| 9 | 12/9/2015 | Transfer | Account x-6117 | $10,000.00 |
| 10 | 12/30/2015 | Check | 5229 | $18,812.00 |
| 11 | 12/30/2015 | Check | 5222 | $13,125.00 |
| 12 | 12/30/2015 | Transfer | Santander account x-7726 | $37,500.00 |
| 13 | 2/11/2016 | Wire | 20160211C1QAE01X000702 | $45,000.00 |
| 14 | 2/12/2016 | Wire | 20160212C1QAE01X001134 | $14,000.00 |
| 15 | 2/16/2016 | Check | 5209 | $25,000.00 |
| 16 | 3/4/2016 | Wire | 20160304C1QAE01X000664 | $17,000.00 |
| 17 | 3/15/2016 | Wire | 20160315C1QAE01X000618 | $15,000.00 |
| 18 | 3/24/2016 | Wire | 20160324C1QAE01X000591 | $15,000.00 |
| 19 | 5/4/2016 | Check | 5071 | $20,225.52 |
| 20 | 5/6/2016 | Check | 5210 | $25,000.00 |
| 21 | 7/5/2016 | Transfer | Account x-3759 | $10,000.00 |
| 22 | 7/6/2016 | Check | 5438 | $13,000.00 |
| 23 | 7/6/2016 | Check | 5446 | $14,600.00 |
| 24 | 7/7/2016 | Cash | | $14,500.00 |
| 25 | 7/8/2016 | Transfer | Account x-6117 | $10,000.00 |
| 26 | 7/12/2016 | Check | 5263 | $13,500.00 |
| 27 | 7/13/2016 | Wire | 20160713C1QAE01X000642 | $20,000.00 |
| 28 | 7/15/2016 | Check | 1001266 | $27,210.00 |
| 29 | 7/15/2016 | Wire | 20160715C1QAE01X001162 | $15,000.00 |
| 30 | 8/3/2016 | Wire | 20160803C1QAE01X000889 | $20,000.00 |
| 31 | 8/4/2016 | Check | 5439 | $19,800.00 |
| 32 | 8/4/2016 | Wire | 20160804C1QAE01X001027 | $19,800.00 |
| 33 | 8/4/2016 | Wire | 20160804C1QAE01X000645 | $10,000.00 |
| 34 | 8/5/2016 | Cash | | $17,500.00 |

[14] This is a Federal Reserve tracking number.

| | Date | Transaction Type | Check No., Recipient Account or IMAD[14] Number | Amount |
|---|---|---|---|---|
| 35 | 9/1/2016 | Wire | 20160901C1QAE01X001757 | $20,000.00 |
| 36 | 9/6/2016 | Cash | | $14,000.00 |
| 37 | 9/8/2016 | Check | 5386 | $10,600.00 |
| | | | | |
| | | | TOTAL | $681,672.52 |

68.     Additionally, as noted above, there were four cash withdrawals—two on March 11, 2016, for $9,500 and $360 respectively, and two on March 14, 2016, for $350 and $250, for a total of $10,410.  Together, there were $692,082.52 in unlawful monetary transactions (or attempted transactions).[15]

69.     The chart only includes those transactions which appear to be for expenditures unrelated to any legitimate development of the real estate projects.  For example, the chart includes $56,410 in cash withdrawals (item numbers 24, 34, and 36 in the chart above, and the aggregate cash withdrawals described in paragraph 68 above) because the investigation has indicated that contractors were not paid in cash for any work on the projects.  The chart also includes $147,000 in penalty payments (item numbers 7, 13, 27, 30, and 35) that Wolas made in connection with extending the closing on the Beachcomber property.  And the chart includes $53,000 in payments (item numbers 3, 5, 6, and 16) to an individual who, as described above, received more than $300,000 from Wolas and moved some of the funds into a foreign exchange company and sent some funds overseas.

70.     For all of these transactions, based on Special Agent Bell's training and experience, and based on the analysis that she performed with Special Agent Coughlan, Wolas

---

[15] The September 8, 2016 attempted transaction resulted in a check returned for insufficient funds.  Therefore, the total the Defendant dissipated was $681,482.52.

would necessarily have to have used some (or all) of the criminally derived investor funds in order to cover each check, withdrawal, transfer and/or wire transaction that is identified in the chart above.

## THE DISSIPATION AND CONCEALMENT OF ASSETS

71.     The Defendant appears to have dissipated at least $681,482.52 involved in the banking law violations, and the Defendant has affirmatively misstated his access to funds, under oath, to a United States Magistrate Judge. Unless he is enjoined, the Defendant will continue to dissipate the criminal proceeds and property involved in his offenses.

### COUNT 1
(18 U.S.C. § 1345 – Injunctive Relief)

72.     The United States realleges and incorporates by reference paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73.     Among other things, the Defendant has committed a banking law violation, as defined in 18 U.S.C. § 3322(d)(1)(A), by engaging in multiple transactions in criminally derived property, in violation of 18 U.S.C. § 1957.

74.     The Defendant already has dissipated hundreds of thousands of dollars of property involved in the banking law violations, and intends to continue dissipating assets.

75.     The Defendant's banking law violations are crimes against the United States and constitute a continuing and substantial injury to the United States and its citizens.

76.     The United States brings this action to protect its financial institutions and financial system by restraining the transfer of funds and assets now in the Defendant's hands, specifically those funds held in the retirement account, the the Hunton & Williams LLP Retirement Savings Plan A (the "Plan").

77.     Upon a showing that the Defendant is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation, the United States is entitled under 18 U.S.C. § 1345(a)(2), to a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining the Defendant from alienating, disposing, withdrawing, transferring, removing, dissipating, or disposing of any property obtained as a result of a banking law violation, property traceable to such violation, or property of equivalent value, specifically the contents of the retirement account.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays that this Court:

Issue a Temporary Restraining Order and Preliminary Injunction in this matter against the Defendant, and that a permanent injunction shall be issued forthwith, that orders the Defendant, his agents, servants, employees, attorneys, and all persons acting in concert and participation with the Defendant, including all corporations over which he exercises control, and the custodians of the Plan and all other persons seeking to move, transfer, or otherwise dissipate the Plan funds, be enjoined as follows:

1.     From withdrawing or transferring any moneys or sums of money presently deposited, or held in the Plan.

2.     From transferring, selling, assigning, dissipating, concealing, encumbering, impairing or otherwise disposing of, in any manner, assets, real or personal;

3.     To preserve all personal, business, financial, and accounting records, including bank records, that detail the Defendant's business operations and disposition of any payment that directly or indirectly arose from the payment of money to the Defendant related to the fraud scheme and banking law violations described herein;

4.      To provide an accounting of all assets, within seven calendar days, and to provide on a monthly basis, commencing forthwith, suitable reports detailing his financial condition;

5.      To complete a Financial Disclosure Statement form provided to the Defendant by the United States within seven calendar days;

6.      For disgorgement and restitution of all of the Defendant's ill-gotten gains; and

7.      For such other and further relief as the Court shall deem just and proper.

Dated: June 2, 2017                     Respectfully submitted,

                                        WILLIAM D. WEINREB
                                        Acting United States Attorney

                               By:      /s/ David G. Lazarus
                                        SANDRA S. BOWER. 787700 (Florida)
                                        BRENDAN MOCKLER, B.B.O. # 569140
                                        DAVID G. LAZARUS, B.B.O. # 624907
                                        Assistant United States Attorneys
                                        United States Attorney's Office
                                        1 Courthouse Way, Suite 9200
                                        Boston, MA 02210
                                        (617) 748-3100
                                        david.lazarus2@usdoj.gov

## VERIFICATION

I, Kelly M. Bell, Special Agent, Federal Bureau of Investigation, state that I have read the foregoing UNITED STATES' *EX PARTE* VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION, and that the contents thereof are true to the best of my knowledge, information and belief.

_____
Kelly M. Bell, Special Agent
Federal Bureau of Investigation

Dated: June 2, 2017

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                                                                        Boston

Then personally appeared before me the above-named Kelly M. Bell, Special Agent, Federal Bureau of Investigation, who acknowledged the foregoing to be true to the best of her knowledge, information and belief, on behalf of the United States of America.

Subscribed to and sworn to before me this 2nd day of June, 2017.

_____
Notary Public
My Commission Expires: 3/12/2021

JEAN L. JAMIESON
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
March 12, 2021

27



